Frederick PURVIS, Appellant,

v.

UNITED STATES, Appellee.

No. 5301.

District of Columbia Court of Appeals.

Argued Sept. 28, 1970.

Decided Nov. 6, 1970.

Matthew W. Black, Jr., Washington, D. C., appointed by this court, for appellant.

Brian W. Shaughnessy, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., John A. Terry and Percy H. Russell, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before FICKLING, GALLAGHER and NEBEKER, Associate Judges.

GALLAGHER, Associate Judge:

Appellant was convicted of unlawful possession of heroin [1] by the trial court sitting without a jury. He was sentenced to 270 days imprisonment. This appeal followed.

For reasons which will appear, the only witness at the trial was one of the arresting officers. He testified that in the early afternoon of January 7, 1970, he and another officer, both dressed in plain clothes, were patrolling in an unmarked car (a private automobile). They approached the intersection of 12th and M Streets, N.W., from the south and were preparing to turn east on M Street. At this point, the officers saw appellant and his companion on the northwest corner of 12th and M Streets starting to cross to the southwest corner; and when they were across the middle of the street they looked at the vehicle and at each other and returned to the northwest corner. The officer further testified that their vehicle was stopped in the middle of the turn to observe the two men, who then started to cross to the northeast corner of 12th Street, but returned to the northwest corner.[2] Then they again crossed to the northeast corner, toward the vehicle, where they paused. At this time, from the vehicle across the street the officer noticed "a bulge" in the left pocket of appellant's coat, which was a three-quarter length jacket. The bulge was the size of an apple but did not project outwardly as much as an apple

1. D.C.Code 1967, § 33–402.

2. There appears to be a variance on this particular point between the officer's testimony on direct and cross-examination (Tr. 7, 18).

would. Appellant and his companion then crossed M Street to the southeast corner, which is where the vehicle had stopped. The officers left the vehicle, identified themselves, "patted down" the two men and removed the contents from the bulging pocket of appellant. This developed to be a small plastic container, which was wrapped in a handkerchief along with a manila envelope containing a white powder. The officer observed there were 18 capsules. When asked whether he was a diabetic appellant said he was not. He was then placed under arrest and advised of his constitutional rights. Prior to this occasion the officer had seen appellant, but said he knew nothing about him.

At the conclusion of the officer's testimony, events got a bit complicated. The prosecuting attorney announced to the trial court that he and defense counsel agreed to stipulate that the material removed from appellant was heroin and that the chain of custody need not be proved. Whereupon the Government rested its case. Defense counsel then undertook to explain the stipulation so that it would not be misunderstood. The trial court stated there was no need to do so as the stipulation was clear and was not misunderstood.

Apparently sensing what was coming, defense counsel then moved for a judgment of acquittal and, upon being asked by the court why it should be granted, stated that no material was introduced into evidence. The court said that the stipulation eliminated any necessity for that. Defense counsel replied that this was precisely the point he was attempting to explain to the court: that he was stipulating that "if the Government had presented the items recovered, that the material that was re-

covered would have been heroin." To this the court responded, "That's not by a long shot what you stipulated." The fact is this was the first opportunity defense counsel had to explain precisely what the agreement had been. From there, an extended colloquy took place between the trial court, defense counsel and prosecuting attorney.

It is fair to say that this is what took place. Before trial, the defense attorney consented to accommodate the Government in its effort to shorten the trial by agreeing that the Government need not present the Government chemist to establish that the substance taken by the arresting officer from appellant was heroin; and that the chain of custody of the heroin from the seizure to the time of trial need not be established by testimony. He decided to contest the only genuine issues open to him, namely, the legality of the arrest and the search and seizure of the heroin. His consent to streamline the trial by removing the necessity for the Government to produce overworked and understaffed police and Government chemists was commendable and in the public interest.

During the lengthy colloquy the trial court took the position that the stipulation was to the effect that the substance taken from appellant was heroin; that this removed the necessity of introducing the substance into evidence; and this in turn precluded the opportunity for an objection to its admission on the ground of an illegal search and seizure, thereby excluding the fourth amendment issue from the case.[3]

Defense counsel and the prosecuting attorney both inveighed against such a result. Defense counsel argued, and one might almost say pleaded, that he certainly did not intend to stipulate his client into

3. The record contains no reference to any pre-trial motion to suppress under G.S. Crim.Rules 41(e) so we have no knowledge as to what the situation was in respect to this. In any event, "The rule is not a rigid one" because it provides that the trial court may consider a motion to suppress (or objection) in its discretion at the trial. Jones v. United States, 362

U.S. 257, 262, 264, 80 S.Ct. 725, 732, 4 L.Ed.2d 697 (1960). This rule deals with "an important social policy and not a narrow, finicky procedural requirement." *Id.* Here, at no point did the trial court rule it would not consider the search and seizure questions on their merits due to G.S.Crim.Rule 41(e).

a certain conviction. The prosecuting attorney, clearly believing the honor of the Government was involved, and rightly so, informed the court that "the purpose of the stipulation was to alleviate the necessity of having the narcotic officer and the chemist here. The Government had no intention of causing the defendant to waive any questions he had with respect to the search."

After further unsuccessful attempts to get the court's understanding, in the face of considerable badgering by the court, the defendant was found guilty [4] and sentenced.

This was not the end of it, though, as far as the two earnest Government and defense attorneys were concerned. After the sentencing, they asked leave to approach the bench and it was again put to the court that the "U.S. Attorney, did not, in the terms of the stipulation mean to deprive defense counsel of his opportunity to question the validity of the search." The court's response to this was that if this were the case there was no reason to announce any stipulation; and that "[i]t was up to the prosecutor to offer these objects, taken from the defendant's pocket, into evidence and the propriety of the admission or introduction of the items into evidence would have been before me." At one point, the court attempted to pressure the Government into a stipulation the effect of which was either the guilt or innocence of the defendant by stating "we've reached a point where either you're going to stipulate that he's a winner or you're going to stipulate that he's a loser." Of course, this was a position the Government could not accept. Further attempts by both counsel to enlist the court's cooperation to unravel the situation procedurally were to no avail. As far as the court was concerned, there was no miscarriage of justice because it was plain that the defendant had heroin in his possession when arrested.

But there is such a thing as integrity in the administration of criminal justice. And this is what is involved here. It is almost trite to observe that it is a good measure of the quality of a society. Moreover, it is entirely consistent with a firm, efficient administration of criminal laws, as England has long shown.

One would think the trial court in this non-jury case would have been eager to cooperate with counsel so as to encourage streamlining of trials then and in the future. It would have been a simple matter. At the most, there could have been a brief recess so as to enable the prosecuting attorney to get the narcotics to the courtroom in order to move its admission into evidence. At that point, a stipulation as to its contents and chain of custody could have been announced and, upon objection to the evidence, the fourth amendment issues contested. Instead, the trial court insisted upon ramming down the throats of counsel a stipulation they both agreed they never made, certainly not intentionally. The ironical thing is that it was the Government's burden, not the defendant's, to implement the stipulation procedurally. Yet, the trial court chose to penalize defense counsel and, of course, the defendant. The Government does not need a conviction on these terms and, we hope, never will.

If we were to affirm this conviction on this record, defense counsel in the future would have to be rash indeed to accommodate the Government by entering into good faith agreements such as this in order to shorten criminal trials. While we do not reach these questions here, we state only the obvious when we say the search and the seizure raise substantial questions on this record, to say nothing of the court's exasperating intrusions into the trial.

Appellant did not get a fair trial. The judgment is reversed and the case is remanded for a new trial before another judge.

So ordered.

4. As stated, this was a non-jury trial.

**504**

NEBEKER, Associate Judge (concurring):

While I concur in the court's opinion and judgment, I feel that additional comment is warranted in view of the demeanor of the trial court as reflected in the record. I intend no criticism of the opinion of the court, but simply hope my expressed views will discourage such conduct in the future and thus bring about a real improvement under our new District of Columbia court system.[1]

No doubt the regular exposure to trial of cases can take its toll on a trial judge's capacity for tolerance, objectivity, and judicious behavior. Fortunately, the vast majority of the trial court judges are masters of these traits. They realize that our judicial system, in large part, is no better than its public image. They also realize that the system is publicly judged by lawyers, litigants, witnesses, jurors and spectators, some with frequent but most having infrequent contact with it. They rightly cannot understand why some in such high places should indulge in public outbursts or interludes of ridicule and self-expression. It is unfortunately true that such relatively infrequent instances tend to damage the judicial system in greater degree than the many unsung good works tend to enhance it.

Of course, such conduct must first be controlled from within the person. This requires objective self-analysis along with self-evaluation of intellectual and emotional makeup when subject to trial court milieu. When one indulges in the kind of dialogue which, as here, results in calling lawyers "butchers", and mocking a defendant at sentencing by taking a vote among courtroom spectators on whether they believe he is telling the truth, it is time for some serious reflection on past conduct and positive effort at self-control.

It is apparent that the matter does not end where it begins—at the inner thoughts of the individual. Nor, in my opinion, need this court's review, in this type of case, end with a determination whether the judgment appealed from is fatally infected by the challenged conduct. Such repeated conduct cannot, under our new court system, be left to case-by-case correction when it becomes apparent that method has proven ineffective to prevent such conduct from demeaning the integrity of the whole system.

---

1. Act of July 29, 1970, Pub.L. No. 91–358, 84 Stat. 473.